Robert Clayton BUICK, Appellant,

v.

UNITED STATES of America, Appellee.

No. 21759.

United States Court of Appeals Ninth Circuit.

June 12, 1968.

As Amended on Denial of Rehearing Aug. 8, 1968.

Gladys Towles Root (argued), Los Angeles, Cal., for appellant.

Dennis E. Kinnaird (argued), Asst. U. S. Atty., William M. Byrne, Jr., U. S. Atty., Robert L. Brosio, Asst. U. S. Atty., Chief, Criminal Division, Los Angeles, Cal., for appellee.

Before HAMLEY and BROWNING, Circuit Judges, and SOLOMON,* District Judge.

HAMLEY, Circuit Judge:

Robert Clayton Buick was charged in a twenty-two count indictment with robbing twenty-two federally insured savings and loan associations in violation of 18 U.S.C. § 2113(a) and (d) (1964). Counts 19, 20, 21 and 22 were severed for a jury trial which resulted in convictions on counts 20, 21 and 22. Concurrent twenty-year sentences were imposed, subject to the provisions of 18 U.S.C. § 4208(a) (2) (1964). Buick then took this appeal.

■ Buick first contends, in effect, that a mistrial or a new trial should have been granted because, in violation of the spirit of a sequestration order, a person who listened to the testimony reported thereon from time to time to government witnesses waiting in the witness room.[1]

---

* The Honorable Gus J. Solomon, United States District Judge for the District of Oregon, sitting by designation.

1. In this connection, Buick renews in this court his motion made and denied in the district court that the trial record be corrected to show a colloquy between the trial court and the individual in question. During the colloquy, Buick asserts, that individual admitted that she had been reporting the testimony during the trial. The trial court fully considered the motion and denied it on the ground that the court reporter's transcript was correct. The district court's determination in this regard, made pursuant to Rule 39(b) (1), Federal Rules of Criminal Procedure, and Rule 75(d) (former Rule 75(h)), Federal Rules of Civil Procedure, is final and

On the fifth day of trial counsel for Buick informed the court that she had received information that a woman spectator had been seen entering the witness room after listening to some of the trial testimony. The events, as relayed by Buick's counsel, were sufficient to raise a suspicion that the spectator may have been informing witnesses in the witness room as to what was going on in the courtroom. Counsel stated, however, that she was making "no accusations" and could be "absolutely incorrect."

Counsel did not move for a mistrial, nor did she ask that the court preclude any of the witnesses who heard information from the spectator from testifying. She only asked that the spectator be admonished. This the trial court did.

██ The initial decision to exclude witnesses from the courtroom during trial is within the court's discretionary power and is reviewable only upon a showing of abuse. Young v. United States, 9 Cir., 358 F.2d 429, 431; Williamson v. United States, 9 Cir., 310 F.2d 192, 198. Moreover, notwithstanding a violation of the court's sequestration order, it is within the trial court's discretionary power to fashion an appropriate remedy. Holder v. United States, 150 U.S. 91, 92, 14 S.Ct. 10, 37 L.Ed. 1010; Spindler v. United States, 9 Cir., 336 F.2d 678, 682.

█ Here, even assuming that there had been a violation of the court's sequestration order (see note 1), we hold that the trial court did not abuse its discretion or commit plain error in failing to sua sponte grant a mistrial. Defendant asked for and received the desired admonition. Moreover, Buick does not indicate wherein he was prejudiced by any violation of the court's sequestration order. We conclude that there was no error in this regard.

Buick argues here that the Government obtained his conviction on perjured and fabricated testimony.

There were the usual minor discrepancies in the testimony of several government witnesses and some major variances between their version of events and the version presented by Buick. However, we find nothing to indicate that any of the government evidence was perjured or fabricated.

Buick raises a search and seizure question. He asserts that the officers, not having a warrant for his arrest, nevertheless arrested him on the highway for driving a car with an expired license plate. Since, in fact, the plate had not expired, Buick contends that the officers did not have probable cause to make the arrest and that the arrest was therefore illegal. Buick argues that this rendered unreasonable the search and seizure which followed. It was therefore error, Buick argues, to receive at the trial physical and testimonial evidence resulting from that search and other evidence obtained as the fruit of that search.

█ The testimony pertaining to the arrest, search and seizure was in dispute. The trial court apparently accepted the Government's version, and we do not believe that it erred in doing so. According to the Government, Kelly Whitehead, a patrolman in the Texas Department of Public Safety, and Garry Ingram, a deputy sheriff of Reeves County, Texas, were on duty patrolling along U. S. Highway 80, near Pecos, Texas, on the afternoon of March 29, 1966. They saw a Karmann Ghia automobile traveling west, bearing a 1965 Florida license plate. The officers consulted a memorandum issued by the Texas Department of Safety they had in the car which indicated that 1965 Florida license plates had expired before March 29, 1966.

Assuming, therefore, that the driver was in violation of Texas law for driving with an expired out-of-state license plate, the officers flagged down the Karmann Ghia. They regarded their act in stopping the car as an arrest of the

conclusive. See Cox v. United States, 8 Cir., 284 F.2d 704, 711. The renewed

petition to correct the record is therefore denied.

driver, who turned out to be Buick. Thus their version of when the arrest occurred supports Buick's position that it occurred when he was first stopped on the highway.

In actuality, the memorandum which the officers consulted, while stating that 1965 Florida license plates expire on February 28, 1966, also stated that the 'Enforcement Date—Applicable only to Non-Residents' (non-Texas residents) is April 21, 1966. The testimony indicates that the officers probably did not note this additional statement at the time they stopped the vehicle. Thus if the driver of the Karmann Ghia was not a Texas resident, he was not subject to arrest until twenty-three days after the officers stopped the vehicle on March 9, 1966. But if he was a Texas resident, the driver was subject to immediate arrest.

Having failed to note the above-quoted statement in the memorandum, the officers then thought that they had probable cause to make an arrest. In fact, they only had authority to stop the vehicle and inquire of the driver as to his state of residence in order to ascertain if he was subject to arrest for driving with an expired license plate. But this circumstance is immaterial since, in either event, the vehicle was lawfully stopped and probable cause for arresting the driver on a different ground was revealed during the course of appropriate inquiries after the vehicle had been stopped, as described below.

Continuing with the Government's version of the facts surrounding the arrest and seizure: when Officer Ingram first saw Buick after the latter stepped out of his car, he felt that he recognized him, but could not recall his identity. He asked Buick for his name and was told that it was Mark Anthony Dansereau. Officer Whitehead then asked Buick to produce his vehicle registration and his driver's license. Under Texas law the officer had a right to make this request. See Vernon's Texas Statutes, Art. 6687b, Sec. 13.

Buick told the officers that he was the owner of the car. He produced a 1966 Florida registration from the glove compartment, made out in the name of Mark Anthony Dansereau. Buick also reached back into the car and produced a 1966 Florida license plate.

Buick told the officers that he thought his driver's license was in his brief case in the car. He reached back into the car and took out a small brief case which he placed on the hood of the car. Buick opened the brief case in the immediate presence of the two officers. As he did so, both officers saw in the brief case, in plain view, a chrome plated Derringer pistol.

■■ Officer Ingram reached in and took the gun as soon as the brief case was opened. This he had a right to do not only as a protective measure, but because the presence of the pistol in the brief case, observed by the officers without having made any search, provided probable cause for Buick's arrest. See Texas Penal Code, Chap. 4, Articles 483, 487. The fact that the seizure may have preceded the actual arrest by a matter of minutes is immaterial where it was part of one continuous transaction and the existence of probable cause preceded the seizure.

In the meantime, while the officers were talking with Buick, Officer Ingram came to believe that the driver was not Dansereau, but was the person whose picture and description had been sent to the Reeves County Sheriff's office on a "wanted" poster supplied by the Federal Bureau of Investigation. Officer Ingram had had occasion to review that poster only about an hour before Buick was stopped on the highway. Therefore, when the pistol was removed from the brief case, and both officers saw, under it, and without any search, a gold colored identification bracelet and a quantity of United States currency, Officer Ingram picked up the bracelet to see what name was on it.

■■ Officer Ingram was entitled to do this because he then had probable cause to arrest Buick for carrying a pistol in his car. Moments later it de-

veloped that Buick did not have a driver's license in his brief case or elsewhere in his possession. At that point the officers had probable cause to arrest Buick on the additional charge of operating a vehicle on Texas highways without having in his possession a valid driver's license. See Vernon's Texas Statutes, Art. 6701d, Sec. 153. One officer or the other then informed the driver that he would have to go with the officers and appear before a Justice of the Peace.

▮ Officer Ingram noted that the name on the identification bracelet was "Robert C. Buick." The officer thereupon returned to the patrol car and talked to his office on the radio telephone. He was informed that Robert Clayton Buick was wanted by the F.B.I. for multiple bank robberies in which a chrome-plated Derringer-type hand gun was used. A description was read over the radio telephone to Officer Ingram and it matched the man the officers had stopped in the Karmann Ghia. The officer returned to the latter car, told the driver that he was Buick, and the latter admitted his true identity. The officers then had probable cause to arrest Buick for bank robbery.

Buick was then handcuffed, personally searched, and taken to the Reeves County Sheriff's office. The record does not reveal whether, in addition to being arrested for failure to have a driver's license, he was also arrested for having a hand gun in his car and for bank robbery. Resolution of this factual question is unnecessary, however, inasmuch as, for the reasons stated above, the officers

had lawfully acquired probable cause for arresting Buick on all three grounds, and the seizure of the gun and identification bracelet was incident to one or the other of these bases for probable cause.

Whether the currency and brief case were seized during the confrontation on the highway, or after Buick was turned in at the Sheriff's office, is immaterial. In either event, the seizure, made without a search, was warranted when the officers gained probable cause to arrest for possession of the hand gun and for bank robbery.[2] There being no unreasonable search and seizure we need not discuss the facts concerning the introduction of physical and testimonial evidence thereof at the trial, or what, if any, additional evidence introduced at the trial constituted fruit of the highway seizure.

The trial court did not err in receiving any such evidence.

Buick's final argument is to the effect that testimony of several witnesses was erroneously received because it was based in part upon information gained at a police line-up at which Buick was not represented by counsel, thereby violating his Sixth Amendment right. Buick does not allege facts which indicate that the conduct of the line-up was so conducive to an irreparable mistaken identification that he was denied due process of law.

▮ Defendant relies upon the principle first announced in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178; and Stovall v.

---

2. Since there was no search and the seizure in question was incident to a lawful arrest we have not given consideration to the rule relaxing search and seizure requirements in the case of automobiles. The latter rule was recently restated by the Supreme Court in Dyke v. Taylor Implement Mfg. Co., Inc., 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed. 538, decided May 20, 1968, as follows:

"Automobiles, because of their mobility, may be searched without a warrant upon facts not justifying a warrantless search of a residence or office.

Brinegar v. United States, 338 U.S. 160 [69 S.Ct. 1302, 93 L.Ed. 1879] (1949); Carroll v. United States, 267 U.S. 132 [45 S.Ct. 280, 69 L.Ed. 543] (1925). The cases so holding have, however, always insisted that the officers conducting the search have 'reasonable or probable cause' to believe that they will find the instrumentality of a crime or evidence pertaining to a crime before they begin their warrantless search." (391 U.S. 216, at 221, 88 S.Ct. 1472, at 1475)

Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199. The police line-up in which Buick participated occurred prior to these court decisions. In *Stovall*, at 296–300, 87 S.Ct. 1967, it was held that the police line-up rule is not to be applied retroactively. Buick is therefore not entitled to the benefit of that rule.

Affirmed.